UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-cr-30017-NMG |
| | ) | |
| JAMES MELVIN, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION
UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY
A PERSON IN FEDERAL CUSTODY
(Dkt. No. 247)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

After a jury found James Melvin ("Petitioner") guilty of possession with intent to

distribute and distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1), he was

sentenced to serve 168 months imprisonment followed by six years of supervised release (Dkt.

Nos. 212, 225).[1]  Petitioner, proceeding *pro se*, has now moved under 28 U.S.C. § 2255 to

vacate, set aside, or correct his sentence (Dkt. No. 247).  The United States of America ("the

government") has opposed Petitioner's § 2255 motion and Petitioner has responded (Dkt. Nos.

259, 260).  The trial judge referred the motion to this court for a report and recommendation

(Dkt. No. 261).  *See* 28 U.S.C. §636(b)(1)(b); Fed. R. Civ. P. 72; Rule 10, Rules Governing

---

[1] "Although a motion under 28 U.S.C. § 2255 initiates a civil action, all submissions related to
this motion have been docketed under the original criminal case giving rise to this motion."
*United States v. Watson*, 98 F. Supp. 3d 225, 228 n.1 (D. Mass. 2015).  Accordingly, all docket
citations are to the criminal case docket, 10-cr-30017-NMG.

Section 2255 Proceedings.  For the reasons detailed below, the undersigned recommends that Defendant's motion be DENIED.

II.   FACTUAL BACKGROUND[2]

Petitioner's conviction arose from his sale of approximately 11.5 grams of crack cocaine to a government informant in the parking lot of Frank's Package Store in Springfield on February 19, 2010.  The government informant, Robert K. Williams, Jr. ("Williams"), began working as an informant for the Massachusetts State Police in September 2009 (Tr. 1: 187).  His undercover work for the Federal Bureau of Investigation ("FBI") commenced two months later in November 2009 (Tr. 1: 187-88).  At approximately 2:00 p.m. on February 19, 2010, FBI Special Agent ("SA") Jeffrey Lawrence, the supervisor of the federal task force conducting the undercover operation, directed Williams to call the investigation's target, Anthony Hook ("Foo"), to set up a controlled purchase of crack cocaine (Tr. 1: 196, 198; Tr. 2: 23, 155-56).  During the recorded telephone call, Hook agreed to sell Williams "three and a teenth" of crack cocaine for $500 (Tr. 2: 165-66).[3]  Hook then handed the telephone to a person who Hook described as "one of my young boys, my runner, my peoples" (Tr. 2: 167).  This man, who Williams later identified as Petitioner, directed Williams to meet him in the parking lot of Frank's Package Store and indicated that he would be wearing a black jacket (Tr. 1: 202-03; Tr. 2: 166).

---

[2] The underlying facts are taken from the trial record.  For the purpose of this Report and Recommendation, references to the trial record are abbreviated as follows:  the pretrial conference transcript, Dkt. No. 232 "(PTC: [page])"; the four volumes of trial transcript, Dkt. Nos. 233, 234, 235, 237 "(Tr. #: [page])"; and the sentencing transcript, Dkt. No. 240 "(Sent. Tr.: [page])".

[3] Testimony indicated that this amount referred to three "eight balls," which each weighed one-eighth ounce or 3.5 grams, and a "teenth," which was one-half an "eight ball," or 1.75 grams (Tr. 1: 197).  Hook agreed to sell a total of approximately 12 grams for $500 (*id.*).

After the call, SA Lawrence supplied Williams with $500 and a digital scale (Tr. 1: 197, 200).  Another member of the task force, Massachusetts State Police Sergeant Thomas Fitzgerald, searched Williams' person and his vehicle, a blue Chevy Blazer, for money and contraband with negative results (Tr. 1: 201-02; Tr. 3: 79, 81-82).  Williams was outfitted with an audio transmitter, which permitted the surveillance officers to hear his conversations but did not record, and two digital cameras, which did record (Tr. 1: 199).[4]  SA Lawrence, Sergeant Fitzgerald, and two other officers then followed Williams to the package store in a separate vehicle (Tr. 1: 202, 205).  Williams stopped for gas along the way (Tr. 1: 204).  He was alone in the gas station's store while he paid for gas (Tr. 2: 28-30; Tr. 3: 55-56).

After Williams arrived in the package store's parking lot, Petitioner entered the front passenger's seat of his vehicle (Tr. 2: 155).  According to Williams' testimony, the video recording, and the audio transmission, Petitioner reached into his pants and pulled out a plastic bag containing crack cocaine, and said, "'We got three balls and a teenth'" (Tr. 2: 162, 174).  Williams attempted to weigh the narcotics on the digital scale that he placed on the console between the front seats, but the scale did not work (Tr. 2: 174-75).  According to the audio recording, Petitioner said, "That shit is always on point, you might have extra" (Tr. 2: 175).  During the conversation, Petitioner counted four individually wrapped items that were contained in a larger plastic baggie while saying, "'You got two of these is 7, that's ten and a half, 11' . . . [you have] '12 here'" (Tr. 1:  211-12; Tr. 2: 78-79, 175-76; Tr. 3: 173).  According to Williams, Petitioner was indicating that he was giving him twelve grams of crack cocaine (Tr. 2: 175-76).  Williams then gave Petitioner $500 and Petitioner left Williams' vehicle (Tr. 2: 177).

---

[4] The digital camera on Williams' hat recorded in color and the digital camera on his torso recorded in black and white (Tr. 2: 8, 157).

Notwithstanding SA Lawrence's instruction to Williams regarding the importance of recording Petitioner handing over the drugs, the "actual exchange" of drugs for cash was not recorded by the digital cameras that Williams was wearing (Tr. 2: 22; Tr. 3: 21).

As Williams began to leave the parking lot, an acquaintance, James Clinton, was among a group of people who walked in front of Williams' vehicle (Tr. 2: 73, 178). Williams called out to Clinton who approached Williams and made a joke about his vehicle (Tr. 2: 177; Tr. 3: 50-52). Williams testified that he rolled down the driver's side window with his left hand, reached out of the window with his right hand, and "slapped [Clinton] five" (Tr. 2: 74, 183-84; Tr. 3: 52). Williams denied that he was holding anything when his hand met Clinton's (Tr. 2: 184).

The surveillance officers followed Williams to the predetermined debriefing location where he turned over 11.5 grams of crack cocaine to SA Lawrence (Tr. 1: 207, 209, 210; Tr. 2: 96, 185). Sergeant Fitzgerald did not recover any other narcotics or money when he searched Williams' person and vehicle (Tr. 1: 209, 210; Tr. 3: 83).

Petitioner testified in his defense that, on February 19, 2010, Hooks provided him with twelve grams, or approximately one-half ounce, of high grade hydroponic marijuana, which he exchanged with Williams for $500 in Williams' vehicle in Frank's Package Store parking lot (Tr. 3: 124-27, 133, 144-45, 147, 154-55).[5] Petitioner testified that the marijuana was a light green substance, but the sunlight made it appear to be white on the video recordings (Tr. 3: 127, 155, 157, 167). For comparison, Petitioner pointed to the black garbage bag the covered Williams' front passenger side window, which he alleged appeared gray in the video recordings (Tr. 3: 127). Petitioner also told the jury that the white or off-white ball that he was seen holding in the

---

[5] Agent Lawrence testified that in 2010, one half ounce of marijuana sold for about $150 in Springfield (Tr. 3: 171-72).

4

video was the empty, crumpled, larger plastic sandwich bag from which Williams had removed the smaller bags of marijuana in order to weigh them (Tr. 3: 138-39, 141-44, 146-47, 161-62).

Notwithstanding Petitioner's representation to Williams regarding the narcotics "always [being] on point," Petitioner testified that this was the only time he made a delivery for Hooks (Tr. 3: 135-36).  However, he stated that he previously had served Hooks as a lookout (Tr. 3: 130).

III.   <u>PROCEDURAL HISTORY</u>

On May 20, 2010, a grand jury sitting in the United States District Court for the District of Massachusetts returned a single count indictment charging Petitioner with distributing cocaine base or possessing cocaine base with intent to distribute (Dkt. No. 2).  *See* 21 U.S.C. § 841(a)(1). The government filed an information pursuant to 21 U.S.C. § 851 before Petitioner's first trial, which commenced on November 28, 2011 before Judge Nathaniel M. Gorton and a jury (Dkt. No. 97).  After the jury found Petitioner guilty, Judge Gorton sentenced him to 180 months in prison and six years of supervised release (Dkt. Nos. 111, 127).  On September 17, 2013, Petitioner's conviction was vacated and the case was remanded for a new trial.  *See United States v. Melvin*, 730 F.3d 29, 40 (1st Cir. 2013).

On retrial in March 2014, a jury again found Petitioner guilty and Judge Gorton sentenced him to 168 months of imprisonment and six years of supervised release (Dkt. Nos. 201, 206, 207, 208, 212, 225).  The First Circuit affirmed the conviction, *see United States v. Melvin*, 628 F. App'x 774, 778 (1st Cir. 2015), and the Supreme Court denied the petition for a writ of certiorari on February 29, 2016 (Dkt. No. 246).  *See Melvin v. United States*, 136 S. Ct. 1236 (2016).

5

On January 12, 2017, Petitioner moved to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255 (Dkt. No. 247). Judge Gorton ordered the government to respond (Dkt. No. 248). *See* 28 U.S.C. § 2255(b); Rules 4(b) & 5(a), Rules Governing Section 2255 Proceedings. The government filed its opposition and Petitioner replied (Dkt. Nos. 259, 260). *See* Rule 5, Rules Governing Section 2255 Proceedings.

Petitioner claims that his trial counsel at both trials, Attorney William O'Neil ("Attorney O'Neil"), rendered ineffective assistance at the second trial by failing to: (1) subpoena James Clinton to testify that Williams transferred marijuana to him in the parking lot of Frank's Package Store on February 19, 2010; (2) withdraw from Petitioner's case due to a conflict of interest; and (3) effectively communicate the government's plea offer (Dkt. No. 247 at 4-5). In addition, Petitioner moves to correct his sentence based on the Board of Prisons' ("BOP") alleged representation that Petitioner's 168 month sentence would run consecutive to a 51 month sentence imposed by the United States District Court for the Southern District of New York for violating conditions of supervised release (*id.* at 5).

IV.   LEGAL STANDARDS

A.   28 U.S.C. § 2255

Section 2255 "provides for post-conviction relief in four instances, namely, if the petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998) (citing *Hill v. United States*, 368 U.S. 424, 426-27 (1962)). "The fourth category includes only 'assignments of error that reveal "fundamental defects" which, if uncorrected, will "result in a complete miscarriage of justice," or irregularities that are "inconsistent with the rudimentary

demands of fair procedure.'"" *United States v. Mahan*, Criminal No. 10-10073-NMG, 2015 WL 4762652, at *4 (D. Mass. Aug. 11, 2015) (quoting *David*, 134 F.3d at 474).  "[Petitioner] bears the burden of establishing the need for section 2255 relief." *Id.*  "Where, as here, a petitioner is acting *pro se*, his petition must be 'liberally construed . . . [and] a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *United States v. Robinson*, 227 F. Supp. 3d 141, 146 (D. Mass. 2016) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

Although Petitioner has not requested an evidentiary hearing, § 2255(b) states that the court "shall . . . grant a prompt hearing" on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  "The language of section 2255 . . . 'does not strip the [Court] of all discretion to exercise [its] common sense.'"  *Kiley v. United States*, 260 F. Supp. 2d 248, 258 (D. Mass. 2003) (alteration in original) (quoting *Machibroda v. United States,* 368 U.S. 487, 495 (1962)).  The First Circuit has held that "[a] prisoner who invokes section 2255 is not entitled to an evidentiary hearing as a matter of right." *David*, 134 F.3d at 477 (citing *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993)).  Petitioner has the burden to show, by a preponderance of the evidence, that he is entitled to one.  *See Moreno–Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003) ("Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted."); *David*, 134 F.3d at 478.

"[A] district court properly may forgo [a hearing] when (1) the motion is inadequate on its face, or (2) the movant's allegations, even if true, do not entitle him to relief, or (3) the movant's allegations 'need not be accepted as true because they state conclusions instead of facts,

contradict the record, or are "inherently incredible.""" *David*, 134 F.3d at 477 (quoting *McGill*, 11 F.3d at 225-26); *see also Owens v. United States*, 483 F.3d 48, 57 (1st Cir. 2007), *abrogated on other grounds by Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017); Rule 4(b), Rules Governing Section 2255 Proceedings.  To determine whether a petitioner is entitled to a hearing, the court reviews the "expanded record," which includes "the answer, any transcripts and records of prior proceedings," and additional submitted materials, including affidavits.  Rules 7 & 8(a), Rules Governing Section 2255 Proceedings.  *See Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977) ("[T]he district court may make its preliminary assessment of the motion's merits on an expanded record that may include 'in an appropriate case, even affidavits.'") (quoting *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970)).  "However, material issues of fact may not be resolved against the petitioner solely by relying on *ex parte*, sworn or unsworn, statements of the government or defense counsel."  *United States v. Butt*, 731 F.2d 75, 77-78 (1st Cir. 1984) (internal citations omitted).  "Affidavits may assist only in determining if there is a genuine issue of fact to resolve."  *Miller*, 564 F.2d at 106 (citing *Blackledge v. Allison*, 431 U.S. 63, 80 (1977)).  "An evidentiary hearing is required if the records and files in the case, or an expanded record, cannot conclusively resolve substantial issues of material fact, 'and when the allegations made, if true, would require relief.'"  *Butt*, 731 F.2d at 78 (quoting *United States v. Fournier*, 594 F.2d 276, 279 (1st Cir. 1979)).  *See Carpenter v. United States*, 478 F. Supp. 2d 205, 214 (D.R.I. 2007) ("Genuine issues of material fact may not be resolved without a hearing . . . .").

      B.     <u>Ineffective Assistance of Counsel</u>

      "In all criminal prosecutions, the accused shall enjoy the right to . . . the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "The touchstone for determining whether an attorney's performance falls below the constitutional norm is whether counsel has brought 'to

bear such skill and knowledge as will render the trial a reliable adversarial testing process.'"

*Scarpa v. Dubois*, 38 F.3d 1, 8 (1st Cir. 1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

In *Strickland*, the Supreme Court developed a two prong test to determine claims of ineffective assistance of counsel.  *See Mahan*, 2015 WL 4762652, at *4.

> [T]o establish counsel ineffectiveness, a defendant must prove that (1) "counsel's performance was deficient . . . that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "the deficient performance prejudiced the defense . . . that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*United States v. Guerrero*, Criminal No. 08-10197-LTS, 2015 WL 6958071, at *3 (D. Mass. Nov. 9, 2015) (quoting *Strickland*, 466 U.S. at 687).   A petitioner's failure to make the required showing on either prong "defeats the ineffectiveness claim."  *Strickland*, 466 U.S. at 700.

Under the first prong "a [petitioner] must show that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Rosado v. Allen,* 482 F. Supp. 2d 94, 101 (D. Mass. 2007) (quoting *Strickland*, 466 U.S. at 690). "This evaluation of counsel's performance 'demands a fairly tolerant approach.'"  *Id.* (quoting *Scarpa*, 38 F.3d at 8).  "'[T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance.'"  *Murchu v. United States,* 926 F.2d 50, 58 (1st Cir. 1991) (alteration in original) (quoting *United States v. Ortiz Oliveras,* 717 F.2d 1, 3 (1st Cir. 1983)).  *See United States v. Natanel,* 938 F.2d 302, 309–10 (1st Cir. 1991).  Because "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,'" *Smullen v. United States*, 94 F.3d 20, 23 (1st Cir. 1996) (quoting *Strickland*, 466 U.S. at 689), "the burden that [a petitioner] faces when filing a section 2255 motion is unquestionably heavy . . . ."  *Mahan*, 2015 WL 4762652, at *5.

The second *Strickland* prong requires a petitioner to establish that counsel's subpar performance was prejudicial to the defense. *See Strickland*, 466 U.S. at 692. The prejudice prong "entails 'a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."'" *Rosado*, 482 F. Supp. 2d at 101 (quoting *Scarpa*, 38 F.3d at 8). *See Padilla v. Kentucky*, 559 U.S. 356, 366 (2010). Put another way, "'[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Argencourt v. United States*, 78 F.3d 14, 16 (1st Cir. 1996) (quoting *Strickland*, 466 U.S. at 691).

V.      ANALYSIS

A.      Counsel's Failure to Subpoena James Clinton to Testify

Petitioner first claims that he was deprived of his Sixth Amendment right to compulsory process for obtaining witnesses to testify on his behalf by Attorney O'Neil's failure to subpoena James Clinton (Dkt. No. 247 at 4). *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."); *Bowling v. Vose,* 3 F.3d 559, 561 (1st Cir. 1993) (a criminal defendant's "[e]xercise of the right [to compulsory process] assists the adversary process in its truth-seeking function by ensuring that the trial court hears the full array of admissible facts pertinent to the case."). At trial, the parties agreed that the video recording showed Clinton approaching Williams in his vehicle and touching Williams' hand immediately after Petitioner exited from the vehicle and Williams began driving out of the parking lot. The government claimed that Petitioner had sold crack cocaine to Williams and that he did not transfer anything to Clinton. Instead, the two men just "slapped five." According to the defense theory, however, Williams handed Clinton the marijuana that he had just purchased from Petitioner, which explained why Sergeant Fitzgerald

10

did not find marijuana on Williams' person or in his vehicle after the transaction. Petitioner asserts that his Sixth Amendment right was violated by Attorney O'Neil's failure to subpoena Clinton to testify because Clinton's testimony was necessary to corroborate the defense theory that Petitioner sold Williams marijuana (Dkt. No. 247 at 4; Dkt. No. 260 at 2-4). *See Bowling,* 3 F.3d at 561.

On June 20, 2013, between Petitioner's first and second trials, Clinton signed an "Affidavit" stating that a "friend" had shown him a video recording of Frank's Package Store's parking lot on February 19, 2010 in which he appeared (Dkt. No. 247-1 at 5).[6] According to Clinton's affidavit, Williams called him over to his vehicle and gave him marijuana on that date (*id.*). Petitioner states that he showed Clinton's affidavit to Attorney O'Neil before the second trial (Dkt. No. 247 at 4).

Attorney O'Neil submitted a sworn affidavit confirming that he received Clinton's affidavit before Petitioner's second trial (Dkt. No. 259-1 ¶ 9).[7] Attorney O'Neil states that he spoke to Clinton by telephone on November 5, 2013 "to confirm that he had executed the affidavit and to confirm his willingness to cooperate . . ." (*id.*). On January 8, 2014, after plea negotiations had broken down and it appeared that Petitioner's case would proceed to trial, Attorney O'Neil and his investigator met with Clinton in Attorney O'Neil's office for approximately fifty minutes (*id.* ¶¶ 10, 11). They reviewed Clinton's affidavit and the videotape of Frank's parking lot showing him and Williams (*id.* at ¶ 11). Clinton again indicated that he

---

[6] Although Clinton's statement does not comply with the requirements of 28 U.S.C. § 1746, the government does not dispute that it is an affidavit.

[7] The government submitted Attorney O'Neil's affidavit as an exhibit to its opposition to Petitioner's § 2255 motion (Dkt. No. 259-1). The paragraphs of the affidavit will be cited herein as "Dkt. No. 259-1 ¶ __."

had signed the affidavit, but was unable to confirm its information due to his "poor memory" that he attributed, in part, to "his regular substance abuse" (*id.*).  At a meeting with Petitioner two days later, Attorney O'Neil recounted his meeting with Clinton and told Petitioner that he was not planning to call Clinton as a witness because he would not be "helpful" (*id.* ¶ 12).  Attorney O'Neil did not discuss Clinton with Petitioner again until shortly before the trial in March 2014 (*id.*).

Apparently the government alerted the trial judge to the possibility that Clinton would be called as a defense witness who might invoke his Fifth Amendment privilege against self-incrimination because the judge discussed the issue with counsel at the pretrial conference on March 18, 2014 and expressed his concern that he might need to appoint counsel "on short notice" and might be required "to conduct a voir dire outside the presence of the jury in order to determine if [Clinton] intends to plead the Fifth Amendment on the stand" (PTC Tr.: 5-6).[8] Attorney O'Neil responded by informing the court that he did not anticipate calling Clinton as a witness, but indicated "[t]here may be an outside chance that would change" (PTC Tr.: 6).

According to Attorney O'Neil, he received a message from Clinton three days later, on March 21, 2014, and returned the call (259-1 ¶ 13).  Clinton told Attorney O'Neil that Petitioner had contacted him and "he wanted to help" (*id.*).  Consequently, Attorney O'Neil and his investigator met with Clinton on March 22, 2014 (*id.* ¶ 14).  According to Attorney O'Neil's affidavit, "Clinton reiterated his desire to help [Petitioner] but he again described his poor memory and the difficulty he was having in recalling the events of February 19, 2010 when he had contact with . . . Williams in the Frank's Package Store parking lot. . . . Clinton was unable to confirm . . . that he would be able to testify as to the facts stated in his affidavit" (*id.*).  Based on

---

[8] Clinton's name appeared on Petitioner's witness list (Dkt. No. 182).

Attorney O'Neil's two interviews of Clinton and his theory of defense, Attorney O'Neil concluded that he would not call Clinton as a witness because he would not assist Petitioner's case (*id.* ¶ 15). He communicated his decision to Petitioner and, according to Attorney O'Neil, he did not promise Petitioner that he would call Clinton to testify (*id.* ¶ 16).

In his response to the government's opposition to the § 2255 motion, Petitioner disagrees with Attorney O'Neil's affidavit's representations regarding Clinton's testimony (Dkt. No. 260 at 2). Petitioner claims that when he spoke to Clinton after his trial, Clinton indicated that Attorney O'Neil "informed him that he would not call him to testify because he didn't want the [prosecutor] to 'eat him up on the stand'" (*id.*). Petitioner further alleges that Clinton told him "that he was sure . . . Williams had passed him marijuana" (*id.*).

"A petitioner has the right under the Sixth Amendment to call witnesses 'whose testimony is "material and favorable to his defense."'" *Osorio-Norena v. United States*, 658 F. Supp. 2d 266, 272 (D. Mass. 2009) (quoting *Rock v. Arkansas,* 483 U.S. 44, 52 (1987)). "If petitioner alleges that his counsel acted in error in failing to subpoena witnesses, he must overcome the *Strickland* strong presumption that the decision was legal strategy." *Id.* (citing *Strickland*, 466 U.S. at 687). "[A] defendant must *allege and demonstrate* that his counsel's error clearly 'resulted from neglect or ignorance rather than from informed, professional judgment.'" *Barrett v. United States,* 965 F.2d 1184, 1193 (1st Cir. 1992) (quoting *United States v. Bosch,* 584 F.2d 1113, 1121 (1st Cir. 1978)).

This is not a case in which the petitioner alleges that trial counsel failed to investigate a potential witness's testimony. Petitioner does not dispute that Attorney O'Neil interviewed Clinton as a potential witness based on the affidavit Clinton provided (Dkt. No. 260 at 2).

However, there is disagreement concerning whether or not Clinton would testify that he recalled Williams handing him marijuana.

Attorney O'Neil's sworn affidavit states that he interviewed Clinton twice and, on both occasions, Clinton's "poor memory" prevented him from confirming the facts contained in his affidavit (Dkt. No. 259-1 ¶¶ 11, 14).  Based on Attorney O'Neil's observations during these interactions, he formed the professional opinion that Clinton would offer no assistance to the defense (*id.* ¶ 15).  Consequently, he decided not to call him as a witness (*id.*).  "The decision whether to call a particular witness involves the weighing of risks and benefits; it is 'almost always strategic.'"  *Osorio-Norena*, 658 F. Supp. 2d at 272 (quoting *Lema v. United States,* 987 F.2d 48, 55 (1st Cir. 1993)).  *See Moran v. Hogan*, 494 F.2d 1220, 1223 (1st Cir. 1974) ("The alleged failure of [petitioner's] trial counsel to call [petitioner's wife] as a witness was a question of trial tactics.").  Because the court is required "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the [challenged] conduct from counsel's perspective at the time," *Strickland,* 466 U.S. at 689, Attorney O'Neil's decision not to subpoena Clinton to testify can be viewed as a reasoned and informed strategic one, which is "virtually unchallengeable."  *Id.* at 690.  *See Moran*, 494 F.2d at 1223 (the court refused to "second-guess" trial counsel's decision not to call a witness who would have damaged petitioner's cause); *Godfrey v. United States*, 255 F. Supp. 3d 247, 250-51 (D. Mass. 2017) (based on counsel's "verified affidavit" that he investigated the witnesses petitioner proposed, the court determined that petitioner "has not met his burden to show that his attorney's decision not to call these witnesses was objectively unreasonable.") (citing *Gonzalez-Gonzalez v. United States*, 49 F. App'x 322, 325 (1st Cir. 2002) (unpublished)).

Petitioner's assertion that Clinton recalled receiving marijuana from Williams appears in an unsworn pleading (Dkt. No. 260 at 2). Overlooking this fact and assuming Clinton's proposed testimony would have supported Petitioner's theory of the case, the record is bereft of any indication that Clinton would have waived his Fifth Amendment privilege against self-incrimination and agreed to testify that he committed a federal offense by possessing marijuana.[9] *See* 21 U.S.C. § 841; *Ullmann v. United States,* 350 U.S. 422, 431 (1956) ("'The interdiction of the Fifth Amendment operates only where a witness is asked to incriminate himself - in other words, to give testimony which may possibly expose him to a criminal charge.'") (citation omitted). "[T]he witness's Fifth Amendment right to remain silent takes precedence over Petitioner's right to compel the testimony." *Nobrega v. United States*, 1:10-cr-00186-JAW, 1:15-cv-00134-JAW, 2017 WL 401175, at *6 (D. Me. Jan. 30, 2017) (citing *United States v. De La Cruz*, 996 F.2d 1307, 1312 (1st Cir. 1993)). Thus, "the availability of the putative testimony was problematic at best." *Lema*, 987 F.2d at 54. At the pretrial conference, the judge raised the question of whether it would be necessary for him to appoint counsel to advise Clinton regarding waiver of his Fifth Amendment privilege (PTC Tr.: 5-6). Attorney O'Neil's response -- that he would inform the court if he was going to call Clinton to testify so that the arrangements for counsel could be made -- indicates that Clinton had not waived his privilege against self-incrimination and agreed to testify (*id.*). Because Petitioner has failed to establish that Clinton was an available witness, and because Attorney O'Neil's decision not to call him as a witness was grounded in his reasoned professional judgment, Petitioner has failed to rebut the presumption that he was afforded the effective assistance of counsel. *See Strickland*, 466 U.S. at 689; *Barrett*,

---

[9] The statute of limitations for non-capital federal crimes is five years. *See* 18 U.S.C. § 3282(a). The alleged crime occurred in 2010 and Petitioner's second trial occurred in 2014, which was within the limitations period.

965 F.2d at 1193-94 ("Petitioner's failure to *allege, see Bosch,* 584 F.2d at 1121, let alone

demonstrate, *see id.,* that counsel's tactical decision 'resulted from neglect or ignorance,' *id.,*

effectively insulates counsel's choice among plausible options from successful collateral

challenge in the present circumstances.") (citing *Strickland,* 466 U.S. at 690); *Osorio-Norena*,

658 F. Supp. 2d at 272 ("Although [petitioner] has obtained a supporting affidavit from his co-

defendant for this proceeding, the Court cannot assume that [the co-defendant] would have

waived his Fifth Amendment privilege . . . to testify on [petitioner's] behalf.") (citing *Lema*, 987

F.2d at 54 & n.6).

     Even if Clinton had waived his Fifth Amendment privilege and had testified that

Williams handed him marijuana, the record refutes Petitioner's contention that there is a

"reasonable probability" that Clinton's testimony would have influenced the outcome of the trial

(Dkt. No. 260 at 4).  *Strickland,* 466 U.S. at 694.  *See Godfrey*, 255 F. Supp. 3d at 251.

Petitioner's argument presumes that the jury found Williams' testimony more believable than his

(Dkt. No. 260 at 4).  Petitioner claims that in view of Williams' lack of credibility, Clinton's

corroboration of Petitioner's testimony that he sold marijuana would have raised a reasonable

doubt in the jurors' minds (*id.*).[10]  However, Petitioner's contention overlooks the video

---

[10]Attorney O'Neil marshalled the evidence supporting the defense theory that Williams was a
crack addict who lied about purchasing crack cocaine from Petitioner in order to obtain
government payments, which he used to procure crack cocaine to support his addiction.  In
support of this theory, Attorney O'Neil pointed to the following evidence in an attempt to
discredit Williams' testimony that he was not addicted to crack while he worked for the FBI:
Williams had been a heavy crack user and seller before he assisted the Massachusetts State
Police and the FBI; he had used crack while he was working for the state police in 2009; he did
not undergo drug tests while assisting the FBI; he relapsed in December 2012 while he was still
working for the FBI; he had used money he earned from his work to purchase crack cocaine
instead of fulfilling his legal obligation to pay child support; and before he testified at Petitioner's
trial in March 2014, he told a doctor that he wanted to be admitted to a drug rehabilitation
program (Tr. 1: 188; Tr. 2: 33, 41, 42, 141, 147; Tr. 3: 19, 37-38, 46).  In addition, the FBI began
providing him with a scale to use during controlled buys because on three occasions he was

recordings and photographs depicting the transaction inside Williams' vehicle and the video recordings of Williams' interaction with Clinton, which the government played for the jury and introduced as trial exhibits.  Specifically, the color video recording and color photographs of the transaction depict Petitioner reaching into the front of his pants and removing an item (Ex. 9 at Cam 1 12 49 16_1.jpg, Cam 1 12 49 17_1.jpg; Ex. 23 at 22:12-22:13).[11]  The photographs and the recording also show Petitioner holding a white or off-white object that resembles a ball after he removed it from the scale that was on the console between the seats and while he counted it before handing it to Williams in exchange for currency (Ex. 9 at Cam 1 12 50 27_1.jpg, Cam 1

---

"shorted a good amount" of crack cocaine (Tr. 2: 57-61).  In other words, he returned to the FBI with less than he was expected to purchase permitting the inference that he kept some for himself (Tr. 2: 57-61; Tr. 4: 22).

SA Lawrence told Williams that his receipt of payments was contingent on the government obtaining a certain number of convictions (Tr. 2: 43, 48-49).  Although two AUSAs later corrected this information by informing Williams that he would be paid for his services, Attorney O'Neil asked the jury to infer that SA Lawrence's representation gave Williams an incentive to lie (Tr. 2: 48-49; Tr. 4: 23).  There was evidence that the state police and the United States government had paid "over $49,000" for Williams' services and expenses (Tr. 1: 189; Tr. 2: 35).  According to witnesses, Williams was relentless in seeking additional payments and had refused to testify in some cases in which he acted as an informant until the government paid additional amounts for his benefit (Tr. 1: 191; Tr. 2: 44, 46, 49-51, 53-54).

Other evidence relevant to Williams' reliability as a witness included testimony that he lied to the government and had been convicted of crimes (Tr. 2: 33-34, 142).  Specifically, he had a record of convictions for aggravated assault and battery, larceny from a person, resisting arrest, receiving stolen property, shoplifting, possession of cocaine with intent to distribute as a subsequent offender, and escape (Tr. 2: 142).  Moreover, as "muscle" for Eric Robinson's narcotics operation, he assaulted people who did not pay their drug debts when he determined it was warranted (Tr. 2: 142-43; Tr. 3: 30-31).

[11] Trial Exhibit 9 is a disc that contains still photographs that were produced from the color video recording device placed on Williams' hat (Tr. 2: 11-12).  Individual photographs are referenced in the memorandum by the identifiers shown on Windows Media Viewer.

Trial Exhibit 23 is a DVD of the color video recording produced by the recording device that was placed on Williams' hat.  It runs for 38 minutes and 42 seconds, which is displayed as 00:00 to 38:42 on Windows Media Player.  The approximate times referenced in the memorandum are the times shown on the Windows Media Player that correlate to a particular portion of the DVD.

12 50 33_1.jpg, Cam 1 12 51 04_1.jpg, Cam 1 12 51 05_1.jpg; Ex. 23 at 23:23, 23:28-23:29, 24:00; Tr. 2: 181).  The object that Petitioner is holding in the video and photographs appears consistent with witnesses' descriptions of crack cocaine and inconsistent with Petitioner's testimony that he held light green marijuana and, then, a crumpled sandwich bag (Tr. 2: 97; Tr. 3: 142, 146, 147, 155-157, 173).[12]

The video recordings that captured Williams' interaction with Clinton did not support Petitioner's theory either.  Williams interacted with Clinton almost immediately after Petitioner exited from Williams' vehicle (Ex. 23 at 24:32 to 24:50; Ex. 48 at 24:32 to 24:50).[13]  Williams indicated that he used his left hand to roll down the automatic driver's side window, which can be heard whirring on Exhibit 48 (Tr. 2: 183-84, 186; Ex. 48: 24:32, 24:39).  The video recordings were consistent with Williams' testimony that he exchanged words with Clinton, took his right hand off the steering wheel to reach out the window to "slap [him] five," and closed the driver's side window (Ex. 23 at 24:32 to 24:50; Ex. 48 at 24:32 to 24:50; Tr. 2: 183-84, 186; Tr. 3: 52).  The fact that Exhibit 48 shows that Williams' right hand was empty when he reached out the window and touched Clinton is inconsistent with Petitioner's theory that Williams handed

---

[12] The four individually wrapped balls or chunks of crack cocaine inside a small plastic baggie, which SA Lawrence received from Williams after he conducted the transaction with Petitioner, were introduced into evidence as Exhibit 1 and were available to the jury (Tr. 1: 210-11; Tr. 2: 78-79, 97; Tr. 3: 173).  The chemist removed the contents of the four bags, mixed them together, and ground them up to perform the chemical analysis (Tr. 2: 89, 91, 93-94).  There was one "little" intact piece (Tr. 2: 95).  According to the defense theory, Williams obtained this crack cocaine from a controlled buy in which he had participated before he purchased narcotics from Petitioner and either Sergeant Fitzgerald did not search Petitioner and his vehicle before he drove to Frank's Package Store, or, if he searched, he did not find the crack (Tr. 4: 31-32).

[13] Exhibit 48 is a DVD of the black and white video recording from the camera on Williams' torso.  It runs for 38 minutes and 45 seconds, which is displayed as 00:00 to 38:45 on Windows Media Player.  The approximate times referenced in the memorandum are the times shown on the Windows Media Player that correlate to a particular portion of the DVD.

Clinton the marijuana and could have been used to impeach Clinton if he testified that he received marijuana from Williams.

The government presented other evidence to support its theory that the recordings depicted Petitioner exchanging crack cocaine with Williams.  When Petitioner removed the item from his pants, he told Williams, "We got three balls and a teenth" (Ex. 23 at 22:16-22:18).  According to the task force member James Mazza, who had made "[c]lose to a thousand" narcotics arrests during his twenty-year career as a police officer, he had only heard the terms "ball" and "teenth" used to describe cocaine or crack cocaine  (Tr. 2: 103, 120-21).  The $500 purchase price for the "three [eight] balls and a teenth" was also consistent with the price of crack cocaine in Springfield in 2010 and was inconsistent with the price of marijuana (Tr. 2: 121-22; Tr. 3: 127, 171-72, 174).  Three eight-balls and a "teenth" of crack cocaine, or approximately 12 grams (slightly less than one-half ounce), sold for approximately $490 (Tr. 2: 121-22), whereas one-half ounce of high quality hydroponic marijuana sold for approximately $150 (Tr. 3: 171-72, 174).

Based on the record, even if Attorney O'Neil erred by not calling Clinton as a witness, Petitioner "has not met his burden of showing actual prejudice – that is, showing that the verdict would reasonably have been different had counsel called [him]."  *Godfrey*, 255 F. Supp. 3d at 251.  Accordingly, it is the undersigned's view that Petitioner is not entitled to § 2255 relief based on Attorney O'Neil's failure to subpoena Clinton.

### B.   Counsel's Discipline for Violations of the Massachusetts Rules of Professional Conduct

Petitioner contends that Attorney O'Neil did not provide adequate representation because the Massachusetts Board of Bar Overseers ("BBO") suspended him from practicing law for six months after Petitioner's trial and sentencing had concluded (Dkt. Nos. 212, 224, 225, 247 at 4,

247-3 at 2-3).[14]  Petitioner appears to ask the court to apply an exception to the two-part test enunciated in *Strickland* and to presume a violation of the Sixth Amendment without a demonstration of prejudice.  For the reasons that follow, however, Petitioner's assertions -- that Attorney O'Neil's suspension from practicing law and allegedly concomitant conflict of interest fall into the presumptively prejudicial category -- are unpersuasive.

*Strickland's* two-part test, as described earlier, normally applies to claims of ineffective assistance of counsel.  *See Woods v. Donald*, 135 S. Ct. 1372, 1375 (2015) (per curiam). However, *United States v. Cronic,* 466 U.S. 648 (1984), "'recognized a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense.'"  *Wright v. Van Patten*, 552 U.S. 120, 124 (2008) (quoting *Florida v. Nixon,* 543 U.S. 175, 190 (2004)).  "*Cronic* held that a Sixth Amendment violation may be found 'without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial,' *Bell v. Cone,* 535 U.S. 685, 695 (2002), when 'circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified,' *Cronic,* [466 U.S.] at 658."  *Wright*, 552 U.S. at 124.  *Cronic's* presumed prejudice exception "applies where the defendant has demonstrated that 'the attorney's failure [was] complete.'"  *United States v. Theodore*, 468 F.3d 52, 56 (1st Cir. 2006) (quoting *Bell*, 535 U.S. at 696-97).  "In other words, 'the circumstances leading to counsel's ineffectiveness [must be] so egregious that the defendant was in effect denied any meaningful assistance at all.'"  *Id.* (alteration in original) (quoting *United States v. Griffin,* 324 F.3d 330, 364 (5th Cir.2003))

---

[14] In support of his claim, Petitioner has supplied the BBO's summary of the reasons Attorney O'Neil was suspended from the practice of law for six months in September 2014 (Dkt. No. 247-3 at 2-3).

(citation omitted).  *See Fusi v. O'Brien*, 621 F.3d 1, 6 (1st Cir. 2010) ("*Strickland* requires a case-by-case analysis of whether counsel's deficiencies affected the outcome of a trial, while *Cronic* permits a presumption of prejudice if an actual or constructive denial of counsel occurs during a critical stage of the trial.").

       1.      Suspension from the practice of law.

Petitioner does not dispute that Attorney O'Neil was a member in good standing of the bar at the time of Petitioner's trial and sentencing (Dkt. No. 247-5 at 9).  Attorney O'Neil's suspension, which occurred approximately six months after Petitioner's trial and approximately two months after Petitioner's sentencing, was not presumptively prejudicial (Dkt. No. 247-3 at 2-3).  Courts that have addressed the issue of counsels' breaches of professional responsibility have not found presumptive constitutional prejudice where, as here, the discipline was imposed after counsel's representation of the petitioner had concluded and where the discipline was wholly unrelated to the petitioner's case.  *See United States v. Mitchell*, 216 F.3d 1126, 1132–33 (D.C. Cir. 2000) ("Sometimes . . . the grounds of suspension are sufficiently unrelated to the previously prevailing presumption of competence that no inference can be drawn of ineffectiveness in representation.  Therefore, there is no logical reason to extend the *per se* ineffectiveness rule beyond those instances . . . when a defendant is represented by a person never properly admitted to the practice of law."); *Vance v. Lehman*, 64 F.3d 119, 123-24 (3d Cir. 1995) ("[W]here breaches of professional responsibility are unrelated to the representation of the defendant, courts have not regarded the imposition of sanctions as relevant to the adequacy of an attorney's representation and have not given disbarment orders retroactive effect for Sixth Amendment purposes."); *Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988) (declining to extend the *per se* ineffective assistance rule to disbarment cases, and limiting it to cases of conflict of

interest or egregious misconduct); *Roach v. Martin*, 757 F.2d 1463, 1479-80 (4th Cir. 1985) (declining to establish a *per se* rule of constitutional ineffectiveness where state bar authorities conducted an investigation of defense counsel during a criminal defendant's trial); *United States v. Hoffman*, 733 F.2d 596, 600-01 (9th Cir. 1984) (a defect in counsel's bar status even during trial is not "a per se violation of the Constitution"); *United States v. Sielaff*, 542 F.2d 377, 380 (7th Cir. 1976) ("[T]he subsequent disbarment of [petitioner's] counsel for reasons having nothing to do with [petitioner's] case was irrelevant to his performance at petitioner's trial."); *Theriault v. Maine*, 1:16-cv-00576-JAW, 2017 WL 3812867, at *11 (D. Me. Aug. 31, 2017), *appeal docketed*, No. 17-1901 (1st Cir. Sept. 15, 2017) ("[A]ttorneys can fall short of the local rules of professional conduct, subjecting them to discipline, without necessarily being so deficient that their performance undermined the reliability of the trial."); *United States v. Dumas*, 796 F. Supp. 42, 46 (D. Mass. 1992) ("It does not follow . . . that the imposition of discipline on an attorney previously qualified and in good standing necessarily destroys his status as counsel under the Sixth Amendment."); *Hernandez v. Wainwright*, 634 F. Supp. 241, 246 (S.D. Fla. 1986) ("To hold that [counsel's] performance at [p]etitioner's trial was necessarily deficient because of a wholly unrelated matter or because of his later problems finds no factual support in this record nor in the caselaw.  Based on a review if this record, this Court may not fairly deem [counsel's] legal assistance at [p]etitioner's trial automatically deficient.").

Because a *per se* rule of prejudice does not apply to Attorney O'Neil's violations of the rules of professional responsibility that were unrelated to his defense of Petitioner, Petitioner must demonstrate that counsel's representation met the *Strickland* standard in order to succeed on this claim.  *See Mitchell*, 216 F.3d at 1132 ("We hold that the fact of suspension does not, by itself, render counsel ineffective under the Sixth Amendment.  Instead, the normal *Strickland*

rule applies and a defendant must meet his burden of showing deficient performance at trial which resulted in prejudice."); *Dumas*, 796 F. Supp. at 46-47.  Petitioner supports his claim with the fact that Attorney O'Neil's written motion for judgment of acquittal ("JOA motion") was the same as the written motion he filed after the first trial (Dkt. No. 247-4 at 2-6; Dkt. No. 260 at 7).[15]  However, Petitioner's assertion fails to establish counsel's deficient performance.

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim. P. 29(c)(1).  A JOA motion filed after a guilty verdict asks the trial court to find that the evidence, when viewed in the light most favorable to the government, is legally insufficient to support the verdict.  *See United States v. Hernandez,* 146 F.3d 30, 32 (1st Cir. 1998)  ("[T]he tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.") (citing *United States v. O'Brien,* 14 F.3d 703, 706 (1st Cir. 1994)); *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995).  The rule does not require that the motion contain any specific language in order to place the question of the sufficiency of the evidence before the court.  *See* Fed. R. Crim. P. 29(c).  Attorney O'Neil's timely motion adequately raised the issue and prompted the trial judge's consideration and denial of the motion on the merits (Dkt. No.

---

[15] Petitioner's reply to the government's opposition to the § 2255 motion states:  "[Attorney] O'Neil also failed to put in a motion to dismiss indictment on behalf of the prosecutor's misconduct when the U.S. Attorney went in front of the grand jury and on the fourth such date told the grand jurors of other drug charges which led to an indictment [being returned]" (Dkt. No. 260 at 7).  Because of the summary nature of Petitioner's claim, the court is unable to address it and deems it waived.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do [the] work, create the ossature for the argument, and put flesh on its bones.").

215).  Petitioner fails to demonstrate that Attorney O'Neil's performance was substandard.  *See Alicea-Torres v. United States*, 455 F. Supp. 2d 32, 55 (D.P.R. 2006) ("[D]efense counsel did file a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and the motion adequately presented the question of the sufficiency of the evidence to the trial court.  Therefore, trial counsel did not render ineffective assistance in this regard.").

Even if the JOA motion was flawed, and it was not, when the trial evidence is viewed under the government-favorable standard, *see United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008), Petitioner fails to show that a different JOA motion would have succeeded.[16]  *See United States v. Fisher*, 3 F.3d 456, 463 (1st Cir. 1993) (defendant failed to demonstrate that he was prejudiced by counsel's failure to file motions or to make objections that would not have succeeded).  Petitioner appears to agree with this position by stating that "the government's evidence was adequate to sustain the defendant's conviction against a sufficiency challenge" (Dkt. No. 247-5 at 11).  Indeed, the evidence recounted in the earlier discussion regarding the lack of prejudice due to the absence of Clinton's proposed testimony was sufficient to persuade the jury beyond a reasonable doubt of Petitioner's guilt of the charged offense.  *See Hadfield v. United States*, No. 92-1508, 1992 WL 340307 at *2 (1st Cir. Nov. 20, 1992) (counsel's failure to renew a motion for acquittal did not prejudice petitioner because the evidence "amply supported petitioner's conviction" and "the court would have denied any motion for acquittal.");  *Maldonado-Garcia v. United States*, Civil No. 06-1685(SEC), 2009 WL 2407941, at *3 (D.P.R. Aug. 3, 2009) (counsel's failure to present a renewed motion for acquittal after the jury verdict

---

[16] Petitioner failed to raise the lack of sufficient evidence on appeal.  *See Melvin*, 628 F. App'x at 774-78.

was not prejudicial because the petitioner "failed to show a reasonable probability that . . . said motion would have been granted on the basis of insufficient evidence.").

        2.     Conflict of interest

Petitioner fares no better if his claim is construed as an assertion that he was presumptively prejudiced by Attorney O'Neil's conflict of interest due to his suspension from the practice of law after Petitioner's trial.  The Sixth Amendment's right to the assistance of counsel contains "'a correlative right to representation that is free from conflicts of interest.'"  *United States v. Gorski*, 36 F. Supp. 3d 256, 265 (D. Mass. 2014) (quoting *Wood v. Georgia,* 450 U.S. 261, 271 (1981)); *see also Reyes–Vejerano v. United States,* 276 F.3d 94, 98 n.3 (1st Cir. 2002). If a petitioner can show that his attorney "'actively represented conflicting interests' in breach of the attorney's duty of loyalty, and if the [petitioner] can show that this 'actual' conflict of interest 'adversely affected [the] lawyer's performance,' then the stricter prejudice showing required by *Strickland* does not apply."  *Teti v. Bender*, 507 F.3d 50, 55 (1st Cir. 2007) (quoting *Strickland*, 466 U.S. at 692) (internal quotation marks omitted).  *See Cuyler v. Sullivan,* 446 U.S. 335, 349-50 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."); *United States v. Segarra–Rivera,* 473 F.3d 381, 385 n.2 (1st Cir. 2007) (distinguishing claims in which counsel is alleged to have performed incompetently, which require a showing of prejudice, from claims in which a defendant succeeds in showing that "counsel labored under an actual conflict of interest," which may trigger relief "without regard to proof of prejudice").  Put another way, "[t]o establish an actual conflict of interest, a 'defendant must show that (1) the attorney could have pursued an alternative defense strategy, and (2) the alternative strategy was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties.'"  *United States v.*

*Cardona-Vicenty*, 842 F.3d 766, 772-73 (1st Cir. 2016) (quoting *Familia-Consoro v. United States*, 160 F.3d 761, 764 (1st Cir. 1998)).

Petitioner fails to make either showing necessary for the application of presumptive prejudice.  First, he fails to offer any evidentiary support for his allegation that Attorney O'Neil labored under an actual conflict of interest where his discipline for professional responsibility violations was unrelated to Petitioner's case.  "[T]he possibility of conflict is insufficient to impugn a criminal conviction."  *Cuyler*, 446 U.S. at 350.  *See Cardona-Vicenty*, 842 F.3d at 773 ("[S]peculative or theoretical conflicts of interest do not amount to a Sixth Amendment violation."); *Seng Tan v. United States*, Criminal Action No. 06-10004-02-RGS, 2013 WL 1403485, at *1 (D. Mass. Apr. 4, 2013) ("As an initial (and conclusive) matter, [petitioner] has offered no evidence that counsel engaged in misconduct related to her case.").  Second, Petitioner has failed to identify an adverse effect; that is, "an alternative defense strategy that might plausibly have been pursued but for the attorney's divided interests or loyalties."  *Seng Tan,* 2013 WL 1403485, at *1 (citing *United States v. Ramirez–Benitez,* 292 F.3d 22, 30 (1st Cir. 2002)).  Petitioner points to the JOA motion as evidence of the adverse effect of Attorney O'Neil's alleged conflict.  As discussed earlier, however, Attorney O'Neil's JOA motion complied with rule 29(c) and, in view of the trial evidence, Petitioner fails to identify any alteration that would have made a difference in the motion's outcome.  To the contrary, a review of the transcript of Petitioner's trial discloses a vigorous and competent defense.  Consequently, Petitioner has failed to identify any conflict on Attorney O'Neil's part or any negative impact on his representation of Petitioner due to his alleged divided loyalties.  *See Cordero v. United States*, 253 F. Supp. 2d 173, 175 (D.P.R. 2003) ("[A]n attorney who is anticipating criminal or disciplinary charges stemming from his alleged misconduct unrelated to the defendant may labor

under a conflict of interest.  A defendant seeking post-conviction relief, however, must at least identify a defect in counsel's representation and allege some connection between the misconduct and the defect.").

Petitioner's claims of presumptive prejudice are without merit.  Accordingly, in the undersigned's view, they do not provide a basis for § 2255 relief.

C.   Counsel's Alleged Failure to Communicate the Consequences of a Proposed Guilty Plea Offer

Notwithstanding Attorney O'Neil's efforts to determine the amount of credit that would be applied to Petitioner's sentence for the time he spent in federal custody, Petitioner now claims that he received substandard legal representation because Attorney O'Neil's failure to calculate the credit prevented him from fully explaining to Petitioner the consequences of a proposed plea (Dkt. No. 247 at 4; Dkt. No. 260 at 4-6).  Here again, Petitioner fails to sustain his burden to demonstrate that he was denied constitutionally effective legal representation.  *See Strickland*, 466 U.S. at 687.

An overview of Petitioner's procedural history and the plea negotiations that preceded his second Massachusetts District Court trial is necessary to the court's analysis.  On June 22, 2007, Petitioner pleaded guilty in the United States District Court for the Southern District of New York to conspiracy to commit extortion, extortion, and conspiracy to distribute narcotics and was sentenced to serve concurrent sentences of 60 months and three years of supervised release ("S.D.N.Y. case") (Dkt. No. 216-1 at 1-3).  On March 9, 2012, Judge Gorton imposed a sentence of 180 months imprisonment and six years of supervised release after the first jury found Petitioner guilty of the charged offense ("Mass. Sentence # 1") (Dkt. No. 127).  On May 17, 2012, Petitioner admitted to violating the terms of his supervised release in the S.D.N.Y. case and was ordered to serve 51 months with 18 months to be served consecutively to Mass.

Sentence # 1 ("S.D.N.Y. sentence") (Dkt. No. 220 at 19 n.4).  The First Circuit reversed

Petitioner's Massachusetts conviction on September 17, 2013.  *See Melvin*, 730 F.3d at 40.  After

the jury found Petitioner guilty in the instant case, he was sentenced to serve 168 months in

prison and six years of supervised release (Mass. Sentence # 2) (Dkt. Nos. 224, 225).

The government and Attorney O'Neil engaged in plea negotiations after the First Circuit

reversed Petitioner's conviction and ordered a new trial.  The negotiations are reflected in email

exchanges between Attorney O'Neil and Assistant United States Attorney ("AUSA") Alex Grant,

the prosecutor for the first trial, which are appended to Petitioner's motion (Dkt. No. 247-2 at 2-

14).  On October 8, 2013, AUSA Grant asked if Petitioner would accept a plea under Fed. R.

Crim. P. 11(c)(1)(C) ("(C) plea") with a 60 month sentence (*id.* at 2).[17]  If Petitioner agreed to

those terms, AUSA Grant indicated that he would seek his supervisors' approval of the plea

agreement (*id.*).  Attorney O'Neil responded that Petitioner stated that he would accept time

served, which Attorney O'Neil calculated as "a little over 40 months" (*id*. at 3).  Attorney O'Neil

also indicated that Petitioner "has an outstanding drug charge from Hampden Superior Court that

---

[17] Rule 11(c)(1)(C) addresses plea agreement procedures and states:

> An attorney for the government and the defendant's attorney, or the defendant when
> proceeding pro se, may discuss and reach a plea agreement.  The court must not
> participate in these discussions.  If the defendant pleads guilty or nolo contendere to
> either a charged offense or a lesser or related offense, the plea agreement may specify
> that an attorney for the government will: . . .

> (C) agree that a specific sentence or sentencing range is the appropriate disposition of the
> case, or that a particular provision of the Sentencing Guidelines, or policy statement, or
> sentencing factor does or does not apply (such a recommendation or request binds the
> court once the court accepts the plea agreement).

Fed. R. Crim. P. 11(c)(1)(C).

has yet to be resolved" (*id.* at 4).  According to an email message, AUSA Grant's supervisor rejected Petitioner's time-served proposal stating that he would not go below 60 months and "the front office" might not even agree to a 60 month sentence (*id.* at 3).  On November 13, 2013, AUSA Grant apparently forwarded a draft of a written plea agreement to Attorney O'Neil and indicated that he was "going to send it up for approval" (*id.* at 6).  It was a "(C) plea" for 60 months with 18 months to be served consecutive to the S.D.N.Y. sentence (*id.*).  However, on December 19, 2013, AUSA Grant notified Attorney O'Neil that his "front office is balking at the (C) plea to 60 months" but would accept a "(C) plea" with a sentencing range of 51 to 84 months (*id.* at 8).  AUSA Grant indicated that the government would recommend 60 months and Attorney O'Neil could recommend 51 months (*id.* at 9).  On January 13, 2014, Attorney O'Neil communicated Petitioner's counter offer:  a "(C) plea" with a 60 month sentence to run concurrent with the S.D.N.Y. sentence, a waiver of another presentence report, and imposition of sentence "ASAP" (*id.* at 12).  AUSA Grant rejected Petitioner's counter offer and asked Attorney O'Neil to re-present the offer of the "(C) plea" with the sentencing range of 51 to 84 months (*id.* at 11).  Attorney O'Neil agreed to do so (*id.* at 14).  According to Attorney O'Neil's affidavit, which Petitioner does not dispute, the plea negotiations "reached an impasse," the government never offered Petitioner a formal written plea agreement because there was no "meeting of the minds," and the case proceeded to trial (Dkt. No. 259-1 ¶ 30).

Attorney O'Neil's affidavit stated that when he presented Petitioner with the government's first plea offer of a 60 month sentence, Petitioner was "concerned" about the length of time that he would serve in prison due to the S.D.N.Y. sentence (*id.* ¶ 20). [18]  Because Petitioner would not

---

[18] The chronology of Attorney O'Neil's acts is based on the statements contained in his affidavit, Dkt. No. 259-1 ¶¶ 17-30.

accept a plea offer without knowing the amount of presentence credit he would receive and the allocation of the credit between the S.D.N.Y. sentence and the new Massachusetts federal sentence, he asked Attorney O'Neil to attempt to calculate "the approximate time he would serve for both cases" if the 60 month sentence was imposed (*id.*).  In response to Petitioner's request, on November 22, 2013, Attorney O'Neil contacted a federal probation officer who, in turn, directed Attorney O'Neil to contact the BOP's Classification Unit in Grand Prairie, Texas (*id.* ¶ 22).  The BOP Classification Unit informed Attorney O'Neil that they had no record of Petitioner being in their system at that time notwithstanding the S.D.N.Y. sentence and Mass. Sentence # 1 (*id.* ¶ 23).  On November 26, 2013, Attorney O'Neil contacted Deputy United States Marshal Daniel Spellacy whose records indicated that Petitioner remained in the custody of the Commonwealth of Massachusetts (*id.* ¶ 24).  Attorney O'Neil's further investigation revealed that Petitioner was in state custody awaiting trial in the Hampden Superior Court on a narcotics charge (*id.* ¶ 25).

After Attorney O'Neil discussed the situation with the BOP, the United States Marshal's Office, AUSAs in Massachusetts and the Southern District of New York, Petitioner's attorney in the state case, and Petitioner's attorney in the Southern District of New York, he recommended that Petitioner be released into the custody of the United States Marshals so that the BOP could process him on the S.D.N.Y. sentence and assist Attorney O'Neil in computing the approximate time Petitioner would serve on both sentences if he accepted the government's plea offer (*id.* ¶ 26).  The government assented to Attorney O'Neil's motion to continue Petitioner's trial in order to accomplish his transfer to the federal marshals, which appeared to be the first step in calculating the length of time Petitioner would serve on the proposed sentence (*id.*).  After Petitioner was transferred into the marshals' custody, Attorney O'Neil continued to correspond

with the AUSA in the Southern District of New York concerning the BOP's calculation of the S.D.N.Y. sentence (*id.* ¶¶ 27, 28).  However, Petitioner was not in the BOP's custody as the March 24, 2014 trial date approached (*id.* ¶ 28).

During this time, Attorney O'Neil states that he apprised Petitioner of his status with the BOP and of his "inability to provide specifics as to the length of his possible sentences and the credit he would receive for them" (*id.* ¶ 29).  Consequently, Attorney O'Neil continued to engage in plea negotiations but, as discussed earlier, they did not prove to be fruitful and trial and Petitioner's conviction ensued (*id.* ¶ 30).

Defendants' Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citing *Missouri v. Frye,* 566 U.S. 134, 144 (2012)). "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'"  *Id.* (quoting *McMann v. Richardson,* 397 U.S. 759, 771 (1970)).  "In *Hill,* the Court held 'the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel.'"  *Id.* at 162-63 (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).

Petitioner does not dispute that Attorney O'Neil communicated the government's plea offers, *see Frye,* 566 U.S. at 145, and attempted to determine the amount of committed time Petitioner would serve if he accepted the government's offer (Dkt. No. 260 at 4-6).  Petitioner fails to demonstrate that Attorney O'Neil's persistent efforts to determine the amount of presentence credit to which Petitioner was entitled "fell below an objective standard of reasonableness" as required to meet *Strickland's* performance prong.  *Strickland*, 466 U.S. at 688.  Although defense attorneys have "dut[ies] and responsibilities . . . in the plea bargaining process," *Frye*, 566 U.S. at 144, the court could find no authority for an attorney's obligation to

calculate a client's presentence credit.  *See, e.g.*, STANDARDS FOR CRIMINAL JUSTICE, PLEAS

OF GUILTY 14-3.2 (AM. BAR ASS'N 1999) (listing the responsibilities of defense counsel

regarding guilty pleas).  *Compare Frye*, 566 U.S. at 145 ("[D]efense counsel has the duty to

communicate formal offers from the prosecution to accept a plea on terms and conditions that

may be favorable to the accused."); *Padilla*, 559 U.S. at 373 ("[W]e now hold that counsel must

inform her client whether his plea carries a risk of deportation.").  Indeed, the BOP, not counsel,

computes the credit for time spent in confinement before sentence commences.  *See* 18 U.S.C. §

3585(b);[19] *United States v. Wilson*, 503 U.S. 329, 334-35 (1992) (the Attorney General, through

the BOP, is responsible for computing the credit under § 3585(b)).  The fact that the BOP makes

the computation "after the defendant begins his sentence" is consistent with Attorney O'Neil's

representations that he attempted to get Petitioner transferred to the BOP's custody during plea

negotiations because Petitioner was in state custody at that time, and the BOP would not

compute the credit until Petitioner was in its custody serving the S.D.N.Y. sentence (Dkt. No.

259-1 ¶¶ 22-28).  *Wilson,* 503 U.S. at 333.  *See* 18 U.S.C. § 3585(a) ("A sentence to a term of

imprisonment commences on the date the defendant is received in custody awaiting

---

[19] Section 3585(b) of Title 18 of the United States Code states:

> A defendant shall be given credit toward the service of a term of imprisonment for any
> time he has spent in official detention prior to the date the sentence commences —
>
> > (1) as a result of the offense for which the sentence was imposed; or
> >
> > (2) as a result of any other charge for which the defendant was arrested after the
> > commission of the offense for which the sentence was imposed;
>
> that has not been credited against another sentence.

18 U.S.C. § 3585(b).

transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served."). *Compare Rodriguez v. United States*, No. CA 04-131-T, 2006 WL 3302835, at *1 (D.R.I. Nov. 13, 2006) ("The time spent in federal custody that is credited toward a defendant's federal sentence, initially, is calculated by the . . . BOP after sentence is imposed."). Attorney O'Neil indicated that he explained the situation to Petitioner and continued plea negotiations but "reached an impasse" in mid-February 2014 (Dkt. No. 259-1 ¶¶ 29, 30). In view of Attorney O'Neil's persistent efforts to obtain a presentence credit calculation notwithstanding the absence of his obligation to secure it, Petitioner has failed to demonstrate that counsel's behavior fell below the "objective standard of reasonableness" required of competent counsel. *See Strickland*, 466 U.S. at 688. *Compare United States v. Lagos-Mendoza*, No. CR-09-0157-WFN-1, 2011 WL 2491406, at *2 (E.D. Wash. June 22, 2011) ("credit for time served and the length of sentence is ultimately out of the hands of defense counsel . . . .").

Petitioner also has failed to demonstrate prejudice. "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. Petitioner's contention -- that he might have accepted a plea offer if Attorney O'Neil had explained the "negotiations and calculations . . . in understandable terms" -- suffers from two fatal flaws. First, the government and Attorney O'Neil agree that the government never offered Petitioner a formal plea agreement (Dkt. No. 259 at 9; Dkt. No. 259-1 ¶ 30). A binding plea agreement, like a contract, requires a meeting of the minds concerning its terms. *See United States v. Newbert*, 504 F.3d 180, 185 (1st Cir. 2007) ("Basic contract principles apply to the construction of plea agreements."); *LaPierre v. City of Lawrence*, Civil Action No. 11-12039-RWZ, 2014 WL 4965008, at *1 (D. Mass. Oct. 1, 2014), *vacated on other*

*grounds by* 819 F.3d 558 (1st Cir. 2016) ("It is hornbook law that for an offer and acceptance to create a binding agreement there must be mutual assent, that is, a 'meeting of the minds.'"). Because the government and Petitioner could not agree on the terms of the plea, there was no formal plea offer.  Without a formal plea offer that Attorney O'Neil's alleged unprofessional conduct caused Petitioner to reject, he has failed to demonstrate prejudice.  *See Lafler*, 566 U.S. at 168 ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it.").

In addition, if Petitioner had pleaded guilty, he would have been required to admit that he sold drugs to Williams.  *See* Fed. R. Crim. P. 11(b)(3).  However, Petitioner did not accept responsibility even at the time of his sentencing when he told the court, "From the beginning I've always told my lawyer that I did not sell crack cocaine and to this day to the day I die I will never admit to selling crack cocaine" (Sent. Tr.: 25).  This statement is sufficient to doom Petitioner's claim.  *See Lafler*, 566 U.S. at 171 (in determining the remedy for ineffective assistance of counsel that "caused the rejection of a plea leading to a trial and a more severe sentence . . .  a court may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions."); *Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) ("A defendant who maintains his innocence at all stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer."); *Guerrero*, 2015 WL 6958071, at *3 ("The cursory suggestion in [the petitioner's] brief that he would have opted for a plea is belied by his conduct throughout the proceedings in his case. The record is clear that [he] maintained his innocence throughout the entire proceeding."); *Shelton v. United States*, CR No. 05-049-ML, CA No. 08-365-ML, 2009

WL 1491204, at *8 (D.R.I. May 26, 2009) (in rejecting petitioner's claim of ineffective assistance of counsel, the court considered his unwillingness to accept responsibility for the crime).

Accordingly, in this court's view, Petitioner cannot demonstrate that Attorney O'Neil's alleged failure to communicate a plea offer constitutes a basis to grant relief under § 2255.

D.   Petitioner's Sentence

In ground four of the petition, Petitioner seeks correction of the BOP's calculation of his sentences (Dkt. No. 247 at 5).  His argument is based on the BOP's "Sentence Monitoring Computation Data" as of February 24, 2016, which is appended to the petition, showing the "total term in effect" to be a sentence of 219 months (the sum of the S.D.N.Y. sentence of 51 months and Mass. Sentence # 2 of 168 months) (Dkt. No. 247-5 at 4).[20]  Petitioner challenges the BOP's interpretation that the S.D.N.Y. sentence and Mass. Sentence # 2 are consecutive. According to Petitioner, when the S.D.N.Y. sentence was imposed, he was to serve only 18 months of the 51 month sentence consecutively to Mass. Sentence # 1, but now the BOP computation shows that he will serve all 51 months of the S.D.N.Y. sentence consecutive to Mass. Sentence # 2 (*id.* at 5).  Petitioner appears to be asking the court to direct the BOP to correct its miscalculation by making the S.D.N.Y. sentence concurrent with Mass. Sentence # 2 as it was with Mass. Sentence # 1 before reversal of the conviction (Dkt. No. 247 at 5). Petitioner argues that this change would reflect the "intention of the sentencing court" (*id.*).  The government counters that a § 2255 motion is not the proper avenue of relief (Dkt. No. 259 at 14-

---

[20] It appears that Petitioner received "jail credit" of 764 days from April 14, 2010 to May 16, 2012, the day before the S.D.N.Y. sentence was imposed (Dkt. No. 220 at 19 n.4; Dkt. No. 247-5 at 4).  *See* 18 U.S.C. § 3585(b).

16).  According to the government, Petitioner should, first, exhaust the BOP's administrative remedy and, if he does not succeed, he should file a motion under 28 U.S.C. § 2241 (*id.*).  In reply, Petitioner states that he attempted to remedy his sentence through the BOP, but "was not afforded the desired conclusion or disposition . . . fixing the computation" (Dkt. No. 260 at 8).  The government's argument is persuasive.

Petitioner's complex sentencing history was recited earlier.  In summary, approximately two months after Mass. Sentence # 1 was imposed, Judge William H. Pauley, III of the S.D.N.Y. sentenced Petitioner to 51 months for violating conditions of supervised release (S.D.N.Y. Case No. 1:05-cr-00184-WHP, Dkt. No. 130 at 2).[21]  Judge Pauley ordered that 18 months of the sentence were to be served consecutively to Mass. Sentence # 1 thereby making 33 months concurrent with Mass. Sentence # 1 (*id.*).  Mass. Sentence # 1 was vacated when the First Circuit reversed Petitioner's conviction on September 17, 2013.  *See Melvin*, 730 F.3d at 29, 40.  Judge Gorton entered an "amended judgment" in the instant case on July 8, 2014 by imposing Mass. Sentence # 2 of 168 months and six years of supervised release (Dkt. Nos. 224, 225).

The first step in responding to Petitioner is to determine whether jurisdiction over his claim lies in this court.  "[A] § 2241 petition is properly brought in the district court with jurisdiction over the prisoner's custodian (unlike a § 2255 petition, which must be brought in the sentencing court)."  *United States v. Barrett*, 178 F.3d 34, 50 (1st Cir. 1999).  *See United States v. DiRusso*, 535 F.2d 673, 675-76 (1st Cir. 1976).  If Petitioner's claim is one that is properly

---

[21] The court can take judicial notice of a court docket in a related case.  *See Maher v. Hyde,* 272 F.3d 83, 86 n.3 (1st Cir. 2001); *E.I. du Pont de Nemours & Co. v. Cullen,* 791 F.2d 5, 7 (1st Cir. 1986).

brought in a motion under 28 U.S.C. § 2255, this court has jurisdiction, but this court lacks jurisdiction if the claim should have been brought under 28 U.S.C. § 2241.

"A writ of habeas corpus pursuant to 28 U.S.C. § 2255 'provides the primary means of collateral attack on a federal sentence.'" *Gonzalez v. United States*, 150 F. Supp. 2d 236, 241 (D. Mass. 2001) (quoting *Pack v. Yusuff*, 218 F.3d 448, 451 (5th Cir. 2000) (internal citations omitted)); *Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997) (petition pursuant to § 2255 challenges the imposition of a sentence).

> Thus "§ 2255 is generally the proper vehicle for a federal prisoner's challenge to his conviction and sentence, as it encompasses claims that 'the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.' 28 U.S.C. § 2255, ¶ 1."

*Gonzalez,* 150 F. Supp. 2d at 241 (quoting *Jiminian v. Nash,* 245 F.3d 144, 147–48 (2d Cir. 2001)). *See DiRusso*, 535 F.2d at 674 (§ 2255 grants jurisdiction over a post-conviction claim attacking "the imposition or illegality of the sentence"); *Dirring v. United States*, 370 F.2d 862, 865 (1st Cir. 1967) ("[A] § 2255 proceeding is a collateral remedy available to a petitioner only when some basic fundamental right is denied, and not as routine review at the behest of a defendant who is dissatisfied with his sentence."); *Krilich v. Winn*, No. Civ.A.04-40111-DPW, 2004 WL 2931265, at *1 (D. Mass. Dec. 20, 2004) ("[A] motion to vacate, set aside, or correct a sentence under § 2255 provides the primary means of a collateral attack on the validity of a federal sentence.").

"In contrast to § 2255, a 'motion pursuant to § 2241 generally challenges the *execution* of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, types of detention and prison conditions.'" *Gonzalez*, 150 F. Supp. 2d at 241 (quoting *Jiminian,* 245 F.3d

at 146).  *See also Levine v. Apker*, 455 F.3d 71, 78 (2d Cir. 2006); *Barr v. Sabol*, 686 F. Supp. 2d 131, 136 (D. Mass. 2010).  However, a petitioner must first exhaust administrative remedies before seeking judicial review of a sentence under § 2241.  *See Rogers v. United States*, 180 F.3d 349, 358 (1st Cir. 1999) ("Once administrative remedies are exhausted, see 28 C.F.R. §§ 542.10-542.16, prisoners may then seek judicial review . . . by filing a habeas petition under 28 U.S.C. § 2241.") (internal citation omitted).  *Compare United States v. Olushina*, 63 F. App'x 553, 554-55 (2d Cir. 2003) (unpublished) (petitioner who challenged the BOP's determination of when a concurrent sentence began to run was required to exhaust administrative remedies).

Here, a § 2241 petition is Petitioner's proper vehicle for challenging the BOP's determination of the duration of his sentence.  *See Pack*, 218 F.3d at 451; *Gonzalez*, 150 F. Supp. 2d at 241.  *Compare Larios v. Madigan*, 299 F.2d 98, 100 (9th Cir. 1962) (the question of whether petitioner's federal sentence was concurrent with or consecutive to an earlier imposed state sentence was properly raised in a § 2241 petition); *Joost v. Grondolsky*, Civil Action No. 10-40088-RGS, 2011 WL 1344410, at *1-2 (D. Mass. Jan. 14, 2011) (review of a § 2241 petition challenging the BOP's implementation of two sentences following petitioner's convictions for two separate crimes after one conviction was reversed and a partially consecutive, partially concurrent sentence was imposed after retrial; the court determined that the BOP "committed no error" in implementing the two sentences).  It is unclear from the record whether Petitioner has exhausted the administrative remedies as required by the regulations.  *See Rogers*, 180 F.3d at 358; 28 C.F.R. §§ 542.10-542.16.  When administrative review is complete, a § 2241 petition may be filed in the district court with jurisdiction over the custodian of the facility where the Petitioner is being held.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004); *Krilich,* 2004 WL 2931265, at *1; 28 U.S.C. § 2241(a).  At the time of the filing of the § 2255 motion in the instant

case, Petitioner was incarcerated at FCI Raybrook in New York, not within the District of Massachusetts (Dkt. No. 247 at 1).  Because this court does not have jurisdiction over Petitioner's claim regarding the BOP's calculation of his sentence, the court recommends that this claim be dismissed.

To the extent Petitioner's claim is properly raised under § 2255 as a challenge to an unlawful sentence and if the BOP has determined that Mass. Sentence # 2 is consecutive to the S.D.N.Y. sentence, that determination would be correct if Petitioner was serving the S.D.N.Y. sentence when Mass. Sentence # 2 was imposed.[22]  According to 18 U.S.C. § 3584(a):

> . . . if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt . . . .  Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.

18 U.S.C. § 3584(a).  Because the sentencing order did not indicate that Mass. Sentence # 2 was to run concurrently with the S.D.N.Y. sentence, which was referenced in Petitioner's sentencing memorandum that was submitted to Judge Gorton, the statute presumes that they are consecutive (Dkt. No. 220 at 19 n.4; Sent. Tr. at 30-33).  *See* 18 U.S.C. § 3584(a).[23]

In summary, Petitioner has failed to demonstrate that he was deprived of his right to the effective assistance of counsel due to Attorney O'Neil's failure to subpoena Clinton to testify at trial, or due to Attorney O'Neil's suspension from the practice of law after Petitioner's trial, or

---

[22] It is not clear from the record that Petitioner was serving the S.D.N.Y. sentence when he was sentenced in the instant case, particularly in view of the representation that Petitioner faced pending state charges (Dkt. No. 259 ¶¶ 24, 25).

[23] A challenge to the S.D.N.Y. sentence would require Petitioner to file a § 2255 petition in that district.  *See Barrett*, 178 F.3d at 50.  The court takes no position on whether such a petition would fall within the applicable limitations period.  *See* 28 U.S.C. § 2255(f).

due to counsel's failure to communicate the consequences of accepting a plea offer.  In addition,

either the court lacks jurisdiction to review the BOP's calculation and implementation of

Petitioner's sentences or the claim is without merit.  Accordingly, the court recommends that

Petitioner's § 2255 motion be denied.

VI.     C ONCLUSION

For the above-stated reasons, the undersigned recommends that Petitioner's Motion under

28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Dkt.

No. 247) be DENIED and that no certificate of appealability should issue.[24]

Dated:  April 3, 2018                                    /s/ Katherine A. Robertson
                                                        KATHERINE A. ROBERTSON
                                                        UNITED STATES MAGISTRATE JUDGE

---

[24] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.